Filed 11/7/13  C.M. v. Super. Ct. CA1/1
## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION ONE

| | |
|---|---|
| C.M.,<br><br>     Petitioner,<br><br>v.<br><br>THE SUPERIOR COURT OF THE CITY AND COUNTY OF SAN FRANCISCO,<br><br>     Respondent;<br><br>SAN FRANCISCO DEPARTMENT OF HUMAN SERVICES,<br><br>     Real Party in Interest. | A139365<br><br>(San Francisco City & County Super. Ct. Nos. JD12-3043, JD12-3043A, JD12-3043B) |

Petitioner C.M. (Father) seeks extraordinary relief from an order of the San Francisco City and County Superior Court terminating his reunification services and setting a hearing under Welfare and Institutions Code[1] section 366.26 to select a permanent plan for the minor children, C.M., Ch.M. and G.M.  Finding substantial evidence to support the findings challenged by Father, we shall deny the petition for extraordinary writ on the merits.

## I. FACTUAL AND PROCEDURAL BACKGROUND

### A. *Original Petition*

On February 17, 2012, real party in interest San Francisco Department of Human Services (Agency) filed a section 300 petition alleging Father (aged 42) is father to nine-

---

[1] All statutory references are to the Welfare and Institutions Code.

year-old C.M. (male), seven-year-old Ch.M. (female), and five-year-old G.M. (female), and the children come within section 300, subdivisions (b) and (g). The petition alleged as follows: Mother's whereabouts are unknown. The family has a history of referrals, including sexual abuse by Father of his stepdaughter, G.S. Upon dismissal of the prior dependencies, during which Father was found to be the presumed father of C.M., Ch.M. and G.M., he was awarded sole physical custody of his three children, as well as his stepdaughter, G.S. Father has a history of failing to timely collect the children from their after-school program, sends them to school appearing unwashed and in dirty, malodorous clothes, and fails to provide adequate hygiene for C.M., who suffers from enuresis and is frequently reported as smelling of urine.

The Agency filed a jurisdiction report with the petition, authored by protective services worker (PSW) Judy Chu. Chu reported Father had been negligent in caring for the children, reflected in their chronic absences from school and their poor grooming and hygiene when they did attend school, and failed to follow through on recommendations to reduce absenteeism and for assessments to meet the children's special needs. When Chu attempted to visit the home, Father would not let her in. In addition, she found there was no record of any of the children receiving medical care since 2008.

Chu opined the children were at risk of emotional damage as the result of Father's relationship with their half-sister, his wife's 19-year-old daughter, G.S. Chu noted Ch.M. had been interviewed by clinical psychologist Caroline Salvador-Moses and, according to Salvador-Moses, appeared very uncomfortable when asked about the relationship. Salvador-Moses expressed " 'serious concerns regarding the emotional impact that the inappropriate relationship between [Father] and [G.S.] is having on the children' " and opined Ch.M. is aware there is something not right about the relationship between her older sister and her father. Salvador-Moses stated C.M. also showed signs of discomfort when talking about G.S. and Father " 'but was more hesitant to reveal information, most likely for fear of possible disruption to the family.' "

Chu believed there was a substantial risk the children could be sexually abused because Father may have sexually abused his stepdaughter G.S. as a child. Chu included

2

copies of numerous referrals from past years in which there were reports that G.S. was being sexually abused by Father. Although those referrals were not sustained, Ch.M. now reported she observed the relationship between Father and G.S. when G.S. was 17. Also, the children's school principal stated she saw Father and G.S. interacting in an inappropriate manner when G.S. was 16 or 17. When questioned by another agency social worker, Father denied that he was in a relationship with G.S.

On April 2, 2012, the Agency filed a disposition report, authored by PSW Lily Yee. In the disposition report, Yee stated the current referral was for neglect, and recommended that Father participate in in-home support services to assist with his parenting skills, participate in a psychological evaluation, obtain any therapy he needs, and participate in a substance abuse assessment. Individual therapy was recommended for each of the children. The case plan recommended Father obtain appropriate medical and dental care for the children, ensure the children's regular school attendance and individual therapy, obtain regional center services for G.M., ensure the children maintain proper hygiene and dress appropriately, and maintain a clean and safe home.

PSW Yee noted that the children were making progress in their school attendance in the six weeks since referral, but continued to express concerns about the children's medical care, and about safety issues presented by having so much clutter and debris in the house. Further, because of the alleged sexual relationship between Father and G.S. when she was a minor, the Agency recommended that all three minor children should engage in "counseling for further monitoring of the situation and to address other emotional needs that they may have."

After the jurisdiction/disposition hearing on the original petition was continued, the Agency filed an amended petition on April 20, 2012. The amended petition alleged counts under section 300, subdivisions (b), (c), (d), and (g). Under subdivision (b), the Agency alleged Father needed the Agency's assistance to ensure the children's continued school attendance, compliance with regional center services, and to maintain their medical, dental, and therapeutic services. Under subdivision (c), the Agency alleged the children were "at substantial risk of suffering serious emotional damage as the result of

3

observing the father's long-term (and ongoing) inappropriate 'spousal' relationship between the father and their (now) adult 1/2 sibling [G.S.] (father's step-daughter), who also resides in the home." The Agency alleged under subdivision (d) there was a substantial risk that the children would "be sexually abused by the father due to numerous past reports that father began an inappropriate sexual relationship with the children's adult 1/2 sibling, [G.S.] (father's step-daughter), when she was only fourteen years old."

On June 8, 2012, the Agency filed an addendum report in advance of the contested hearing on jurisdiction and disposition and attached a copy of Salvador-Moses's report prepared in February 2012. The Agency continued to recommend the children reside in Father's home while receiving family maintenance services. Yee had visited the family home a week earlier and described conditions there as "somewhat of a mess," with "crumbs and scraps" on the floor and flies throughout the house.

The jurisdiction/disposition hearing on the amended petition was held on June 15, 2012. Father waived his rights and submitted on the basis of the Agency's reports. The dependency court sustained the counts under section 300, subdivisions (b) and (g), and struck counts alleged pursuant to subdivisions (c) and (d). The court adopted an amended version of the Agency's case plan requiring that Father continue to provide the children with regular medical and dental care, as well as regional center services where appropriate, ensure the children's regular and timely attendance at school, maintain a clean, safe home for the children free of excessive clutter, ensure the children attend school in clean appropriate clothing, place the children in individual therapy and ensure their regular attendance, begin a course of individual therapy, including a psychological evaluation for the purpose of treatment recommendations, and engage in a course of home parenting classes or support sessions.

On November 27, 2012, the Agency filed a status review report authored by assigned PSW Yisel Ledezma for a status review hearing scheduled for December 13, 2012. The report showed little progress had been made on the case plan ordered by the court five months earlier. After being referred for in-home services, Father met the assigned worker but did not maintain contact. On her monthly visits to the family home,

Ledezma had to remind Father to keep the hallways free of clutter and also noted clutter from the living room was spilling into the dining room. Following the Agency's referral, Father had made no arrangements to have his psychological evaluation conducted by Foster Care Mental Health, nor contacted "A Full Circle" for the children's therapy.

**B.** *Supplemental Petition*

On December 10, 2012, just a few days before the status review hearing on the amended petition scheduled for December 13, the Agency filed a supplemental petition under section 387, seeking detention and out-of-home placement for the three children. The supplemental petition alleged Father had been arrested on December 5, 2012, for theft and for sexual abuse of G.S. when she was a minor, and again alleged that the minor children were at substantial risk for possible sexual abuse and/or neglect. The supplemental petition also alleged the children were at risk of harm because Father failed to maintain a safe and clean home, failed to "engage and/or complete" his family maintenance requirements, and is unable to provide proper care, supervision, or shelter for the children.

A section 387 interim review report filed on the same day as the supplemental petition stated all three children had been removed from the home and placed together in a confidential foster home. In the report, Ledezma stated she received a telephone call on December 6, 2012, from Detective Cecilia Garay of the Daly City Police Department, informing her Father and G.S. had been arrested on theft charges. Upon questioning by Detective Garay, G.S. disclosed she had been sexually abused by Father since the age of 12. When Detective Garay released G.S. and took her home, she observed the home was filthy and unsafe. G.S. also told Detective Garay that Father had methamphetamines at the house. Ledezma also spoke with San Bruno Police Detective Brent Schimeck, who advised Father was initially arrested for theft, and after G.S.'s disclosures of sexual abuse, he was rearrested on sexual abuse charges, and was being held in San Mateo County jail.

The section 387 interim review report further related that Ledezma learned the children had been absent for the last two days with head lice, a chronic problem for this

5

family according to school authorities. Ledezma, accompanied by a colleague, went to the home, where they found the children in G.S.'s care, and removed them for placement into foster care. Ledezma and her supervisor then met with Father and G.S. separately on December 10, 2012. Both denied that a sexual relationship began before G.S. was 18 years old. G.S. stated that she and Father are "a couple," claiming she had fabricated her story of sexual abuse for the detective.

Regarding Father's compliance with the existing case plan, Ledezma noted Ch.M. told her the house is cleaned only if Ledezma is expected to visit. Ledezma also reported that Epiphany In Home Services terminated parenting services to Father on November 20, 2012, after he failed to communicate with the case worker. Father had been referred to Foster Care Mental Health for an evaluation and was assigned to a psychologist, who reported she had left several messages for Father, but he had not contacted her. At a hearing held on December 11, 2012, the court found the Agency made a prima facie case there was a substantial danger to the children's physical health or that they were suffering severe emotional damage, issued an order of detention, and set the matter for a contested detention hearing.

In an addendum report filed on December 13, 2012, Ledezma stated each of the children had a CASARC (Children and Adolescent Sexual Abuse Resource Center) interview on December 11, 2012, did not disclose any sexual abuse by Father, but appeared anxious and uncomfortable when questioned about Father and G.S. Ch.M. told the interviewer Father slept in a chair in G.S.'s room. Ch.M. also said her younger sister G.M. might "make a mistake" and say Father and G.S. slept in the same bed. According to Ch.M., G.M. had said this before and had been spanked for it. Upon further questioning regarding physical discipline by Father, all three children disclosed Father used a paddle to spank them on the bottom. Ledezma also related she obtained a copy of the police report, which she attached to the addendum report, documenting G.S.'s disclosure that Father had been having intercourse with her since age 12. San Bruno police had sought and obtained an emergency protective order prohibiting Father from living in the family home.

6

A team decisionmaking meeting was held on December 12, 2012, attended by G.S. and Father's mother (paternal grandmother). Father was at home and out of custody on bail, but did not attend the meeting. It was determined the children should remain in foster care with a recommendation they receive therapeutic visitation. Ledezma's assessment was that Father's relationship with G.S. had created anxiety for the children and they were in a situation where they had to lie about the relationship or risk physical punishment by Father if they told the truth. At the contested detention hearing held on December 13, 2012, the children were ordered detained and placed in foster care and the matter was set for a jurisdiction hearing on the supplemental petition.

On January 29, 2013, the Agency filed an amended supplemental petition adding two counts. Count S-7 alleged: "The children are at substantial risk of suffering serious emotional damage as the result of observing the father's long-term (and ongoing) inappropriate 'spousal' relationship between the father and their (now) adult half-sibling, [G.S.] (father's step-daughter), who also resides in the home." Count S-8 alleged: "The father began engaging in unlawful sexual intercourse with his (now adult) step-daughter, [G.S.], when she was a minor. Per [G.S.]'s own admission, the father began grooming her for sex when she was approximately twelve years old. The children are at substantial risk of sexual abuse by their father due to father's sexual abuse of his step-daughter (the children's half-sibling) when she was a minor."

A contested hearing on the amended supplemental petition was held on April 4 and 5, 2013.[2] The court heard testimony from Ledezma, Detective Cecilia Garay, G.S., and the paternal grandmother. Ledezma testified the young children were experiencing anxiety as a result of the relationship between Father and G.S., based on information she had in the file and her conversations with school personnel. Moreover, Ledezma was told Father had made statements Ch.M. and G.M. are not his biological children, raising concerns he would groom them for sexual abuse as he did with their older half-sister.

_____

[2] Real party in interest's motion to augment the record on appeal to include the reporter's transcript of the hearings held on April 4 and 5, 2013, filed on September 9, 2013, is hereby granted.

Ledezma believed the relationship between Father and G.S. has caused emotional harm to C.M.; for example, the foster mother reported C.M. urinated on the bed after phone calls with Father. On cross-examination, Ledezma testified as to what had changed to prompt the supplemental petition, stating that Father did not comply with the parenting program, the house continued to be chaotic and was more cluttered, the children continued to have head lice, the children's medical needs were not met, and new information came out confirming the suspected sexual abuse. Regarding future services, Father was asked to have individual therapy and a psychological evaluation, and the Agency had requested an individual therapist for Father who specialized in working with perpetrators of sexual abuse.

Detective Garay testified about her interview with G.S. After G.S. was arrested, police searched her cell phone and found a photograph depicting sexual activity between G.S. and Father. When asked about this image, G.S. described Father variously as her stepfather and her boyfriend. G.S. told the detective that Father came into her life when she was eight, and that the sexual abuse began by the time she was 12. Father began by playing a game that led to him exposing himself to G.S., followed by showing her pornography, which then led to escalating sexual abuse. When G.S. was 14 years old, Father became jealous because she had a boyfriend; at that time he was having sexual relations with G.S. as well as G.S.'s mother. After G.S.'s mother left, Father and G.S. continued their relationship. Detective Garay testified G.S.'s statements were not coerced, were not given in return for any promises, and appeared to be honest. When Detective Garay went to the family's house later in the day, she did not feel it was fit for children and contacted the Agency the next day to voice her concerns. Detective Garay had prepared an audio recording of her interview with G.S., in which the girl discussed the sexual abuse by Father when she was 12 years old. The court admitted the recording into evidence during Detective Garay's testimony and listened to the relevant portions during a break on the second day of the hearing.

Father called G.S., who testified she lied to Detective Garay and that she does not consider Father to be her stepfather "[b]ecause we have always had this strong bond.

8

And it grew past the stepfather-stepdaughter relationship." She testified a sexual relationship with Father began when she was 18 years old. She also testified she has a sibling relationship with the three minors and that they are all "very close as friends and siblings." G.S. testified she told detectives there was methamphetamine in the home because she mistook sea salt for methamphetamine.

After closing argument, the court sustained all of the allegations of the supplemental petition except for count S-2, which alleged Father had substance abuse issues. The court determined there was substantial evidence Father sexually abused G.S. when she was a minor and maintained a dysfunctional relationship with G.S. taking advantage of her young age, her vulnerability and feelings of abandonment. Additionally, the court was concerned about the physical and emotional safety of the three minor children, in particular, Ch.M. and G.M., who Father believed may not be his biological children, potentially exposing them to a substantial risk of sexual abuse by Father. The court noted all three children feel they have to lie to protect the two persons they love or face punishment for telling the truth.

The court ordered that dependency status be renewed and that the children be removed from the home and placed in foster care. The court also ordered that services continue to be provided to Father. The court scheduled six- and 12-month review hearings, and reduced Father's visitation from twice a week to once a week.[3]

## C. *Termination of Services and Setting of Section 366.26 Hearing*

On June 13, 2013, the Agency filed a form JV-180 request, asking that Father's visitation be suspended on the grounds he had missed four out of seven visits since the April 5 hearing, and had shown up more than 20 minutes late for the remaining three. Father opposed the request, contending reports for visits prior to the April 5 hearing had been positive, and that he had excuses for each of the visits since the hearing he missed or for which he was late. The matter was set for a contested hearing on July 23, 2013.

_____

[3] On May 17, 2013, Father filed a notice of appeal, challenging the court's jurisdiction and disposition order entered on April 5, 2013, and that matter is now pending before this court in appellate case No. A138707.

9

On June 28, 2013, the children's counsel filed a form JV-180 request to terminate reunification services, on the grounds Father had failed to engage in any of the mandated reunification services in the 12 weeks since the April 5 hearing. Counsel's request was also set for hearing on July 23, 2013.

On July 22, 2013, the Agency filed an addendum report in advance of the July 23 hearing. In the report, Ledezma noted Father had missed two more visits since she submitted the form JV-180 request, and had shown up 10 to 20 minutes late for the others. Ledezma noted Father had not engaged in any of the reunification services. Specifically, Father did not complete the psychological evaluation, had not started individual therapy, did not follow up on the referral for a substance abuse assessment, and failed to make an appointment for drug testing. Also, Father had been in unauthorized and unsupervised contact with C.M. through Facebook, text messaging, instant messaging, and photo stream, and this contact was affecting C.M. negatively.

On July 23 and 24, 2013, the court held a hearing on the Agency's request to suspend visitation and the children's request to terminate services. Ledezma testified she referred Father to a psychologist for the psychological evaluation and provided the psychologist with all of the court records, but Father failed to obtain the evaluation. The psychologist attempted to call Father several times after the April 5, 2013 hearing, but Father did not return her calls or meet with her. Ledezma also referred Father to individual counseling concerning sexual abuse. According to Ledezma, Father did not contact the therapy center until July 19, 2013, just before the hearing on the request to terminate services and six months after the referral was made. Also, Father was uncooperative and refused to sign off on the case plan. In this regard, Ledezma attempted a home visit but no one answered the door, and she made "numerous" phone calls but never received a single call back.

Regarding visitation, Ledezma testified Father had missed five out of eight visits in April and May 2013, and was substantially late for the remaining three. Since mid-June, Father missed two out of six visits, and was at least 10 minutes late for the

remaining four. At no time since the April 5 court hearing had Father called to schedule a make-up visit.

The only other witness at the hearing was Father. With regard to the incomplete psychological evaluation, Father testified he had begun the process before the April 5 hearing, although he admitted that he did not follow through afterwards. He testified that after the hearing he felt like he had lost his kids, so "there was no point." Father admitted he had received a letter from the Agency with his referral for drug testing and therapy, yet failed to explain why he ignored the referrals. Father testified that at one point he thought he was looking at a lengthy prison sentence after the San Mateo arrest; as a result he felt there was no reason to engage in reunification services.

As to visitation, Father stated his former counsel told him visitation had been terminated after the April 5 hearing and he did not learn visitation was still in place until his mother told him. Father explained he missed one visit because he thought visitation was cancelled, one because he was "still in a state of shock," and the rest because he had court dates. Father admitted that he was often late to the visits, but explained that he is habitually late by nature. Father denied he received any telephone calls from Ledezma or that she came by the house to visit him. Father testified that he currently has a sexual relationship with G.S., but denied that he had sexually abused her when she was a minor. Father expressed that he, G.S. and the children are family, and he loves them, while acknowledging actions speak louder than words and his actions have not been very believable. He admitted his actions "have shown that I am not capable of completing my reunification orders."

Following argument of counsel, the court ruled Father had not demonstrated a commitment for reunification with the children and the "impetus for the removal" was Father's conduct with G.S., which the court believed caused emotional distress for the children. The court found Father was in "serious denial of the harm" he has caused his family, and had not demonstrated that he was willing to make any changes in his behavior. The court concluded Father deliberately rejected all services ordered by the

11

court, and the best interests of the children would not be served "by a parent who chooses to do what is best for himself and refuses to do what is best for his own children."

The court found by clear and convincing evidence that Father had failed to participate in any court-ordered treatment program, and there was no substantial probability the children could be returned within the next six months. The court found reasonable services had been provided, there was good cause to terminate reunification services, and set a selection and implementation hearing pursuant to section 366.26 for November 18, 2013. On July 24, 2013, Father filed a timely notice of intent to file a writ petition.

## II. DISCUSSION

### A. *Reasonable Services Were Provided*

" '[O]ur sole task on review is to determine whether the record discloses substantial evidence which supports the juvenile court's finding that reasonable services were provided or offered.' " (*In re Julie M.* (1999) 69 Cal.App.4th 41, 46.) "In making this determination, we recognize that all conflicts are to be resolved in favor of the prevailing party and that issues of fact and credibility are questions for the trier of fact," and that as a reviewing court we "may not reweigh the evidence when assessing the sufficiency of the evidence." (*In re Jasmine C.* (1999) 70 Cal.App.4th 71, 75.)

"Services will be found reasonable if the Department has 'identified the problems leading to the loss of custody, offered services designed to remedy those problems, maintained reasonable contact with the parents during the course of the service plan, and made reasonable efforts to assist the parents in areas where compliance proved difficult . . . .' " (*In re Alvin R.* (2003) 108 Cal.App.4th 962, 972–973.) Services, however, will rarely be perfect; accordingly, " '[t]he standard is not whether the services provided were the best that might be provided in an ideal world, but whether the services were reasonable under the circumstances.' " (*Melinda K. v. Superior Court* (2004) 116 Cal.App.4th 1147, 1159.)

Father contends the reunification services provided to him were inadequate because he "was not offered reasonable services to address 'the fundamental problem that

12

led to the children's detention,' " namely his ongoing "spousal" relationship with his stepdaughter. In this regard, Father does not specify the nature of the services he asserts the Agency failed to provide. Rather, he asserts that after the April 2013 disposition hearing on the supplemental petition, the court did not specify what additional reunification services should be provided to supplement those already in place under the case plan.

Viewed under the substantial evidence standard, Father's characterization of the record on this point is not persuasive. First, at the conclusion of the contested disposition hearing, the court ordered "services continue to be provided to the parent as previously ordered" and gave the Agency discretion "to determine what kind of reunification services [are] to be provided" in addition to those previously ordered. Thereafter, at the July hearing on minors' motion to terminate services, Ledezma testified that among the services initially ordered, Father had to undergo a psychological evaluation and follow the recommendations of the forensic psychologist who conducted the evaluation. To this end, Ledezma referred Father to Foster Care Mental Health and, in October 2012, informed Father he had been assigned to Dr. Katya Cornejo for evaluation and provided him with the doctor's contact information. Father did not contact Dr. Cornejo until after January 2013. Ledezma testified the court's finding at the April 5 disposition hearing of sexual abuse by Father against G.S., and its order services were to be continued, meant Father required further psychological evaluation as well as individual therapy to address the issue of sexual abuse.

As to Father's psychological evaluation, Ledezma did not have to re-refer Father to Dr. Cornejo because the doctor's evaluation was still ongoing due to Father's lack of timely engagement and participation. Dr. Cornejo was prepared to conduct the psychological evaluation in relation to the finding of sexual abuse but was unable to engage with Father. In fact, she called Father on several occasions after the April hearing but Father did not return her calls and failed to attend any session that had been scheduled. Ledezma testified that in December 2012, she referred Father to Foster Care Mental Heath, who in turn referred Father to the OMI Family Research Center (OMI).

13

Father did not, however, go to OMI to do an intake until July 19, 2013, only four days before the July 23 hearing on the motion to terminate services.

In sum, viewing the evidence in a light most favorable to the Agency and indulging all legitimate and reasonable inferences to uphold the court's finding (*In re Misako R.* (1991) 2 Cal.App.4th 538, 545), we conclude the record evidence adduced above constitutes substantial evidence to support the court's finding that reasonable services were provided. The record further demonstrates Father simply failed to "communicate with the [Agency] and participate in the reunification process" (*In re Raymond R.* (1994) 26 Cal.App.4th 436, 441) by availing himself fully of the services provided by the Agency. (See *In re Michael S.* (1987) 188 Cal.App.3d 1448, 1463, fn. 5 [Agency's duty to provide reasonable services does not require "a social worker take the parent by the hand and escort him or her to and through classes or counseling sessions. A parent whose children have been adjudged dependents of the juvenile court is on notice of the conduct requiring such state intervention. If such a parent in no way seeks to correct his or her own behavior or waits until the impetus of an impending court hearing to attempt to do so, the legislative purpose of providing safe and stable environments for children is not served by forcing the juvenile court to go 'on hold' while the parent makes another stab at compliance."].)

## B. *Likelihood of Reunification*

In pertinent part, section 388 provides: "Any party, including a child who is a dependent of the juvenile court, may petition the court . . . to terminate court-ordered reunification services . . . [¶] . . . [¶] [if the] action or inaction of the parent or guardian creates a substantial likelihood that reunification will not occur, including, but not limited to, the parent's or guardian's failure to visit the child, or the failure of the parent or guardian to participate regularly and make substantive progress in a court-ordered treatment plan." (§ 388, subd. (c)(1)(B).)

The dependency court's ruling on a section 388 petition is reviewed for abuse of discretion. (See *In re Katelynn Y.* (2012) 209 Cal.App.4th 871, 881.) "In exercising its discretion, the court has 'the ability to evaluate whether the parent will utilize additional

14

services and whether those services would ultimately inure to the benefit of the minor.' [Citation.] We will not disturb the court's determination unless the court has exceeded the limits of legal discretion by making an arbitrary, capricious or patently absurd determination. When two or more inferences reasonably can be deduced from the facts, we have no authority to reweigh the evidence or substitute our judgment for that of the juvenile court." (*Ibid.*)

Father contends the trial court abused its discretion by finding there was a substantial likelihood reunification would not occur because he had taken some action toward completing the case plan and could have completed it before the six-month review hearing scheduled for October 2013. However, as noted above, Father's participation in the services offered by the Agency was partial and untimely at best, and he made no progress towards alleviating or mitigating the causes for the children's removal from his custody. Significantly, Father failed to complete the psychological evaluation ordered by the court, failed to initiate individual counseling to address the issue of his sexual abuse of his stepdaughter, did not follow up on the referral for a substance abuse assessment, and failed to make an appointment for drug testing. Father continued the "spousal" relationship with his stepdaughter despite evidence of the emotional and psychological damage of this relationship on the children. Father missed the majority of the visitations arranged with the children, was habitually and excessively late for those he did attend, and his unauthorized and unsupervised contact with C.M. through social media affected C.M. negatively. Indeed, Father acknowledged in court that his own actions demonstrated he was incapable "of completing my reunification orders." In sum, we conclude the trial court did not abuse its discretion by finding Father's "action or inaction . . . create[d] a substantial likelihood that reunification will not occur."[4] (§ 388, subd. (c)(1)(B).)

---

[4] Father also contends termination of services was not in the best interests of the minors due to the strong family bond he shares with the children. Father offers no legal authority in support of this argument; accordingly, we deem it to be "without foundation and abandoned." (*Levin v. Ligon* (2006) 140 Cal.App.4th 1456, 1486.) In any case,

### III. DISPOSITION

The petition for extraordinary writ is denied on the merits. (See Cal. Const., art. VI, § 14; *Kowis v. Howard* (1992) 3 Cal.4th 888, 894.) The decision is final in this court immediately. (See Cal. Rules of Ct., rule 8.490(b)(3).)

---

Father may raise this argument at the section 366.26 hearing when the court considers selection and implementation of a permanent plan for the minors. (See § 366.26, subd. (c)(1)(B)(i).)

_____
Margulies, Acting P.J.

We concur:


_____
Dondero, J.


_____
Banke, J.